UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

JEFFREY M. N.,[1]

          Plaintiff,

   v.

ANDREW SAUL,

          Defendant.

Case No.  20-cv-01155-RMI

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 16, 17

    Plaintiff, seeks judicial review of an administrative law judge ("ALJ") decision denying his application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 8 & 10), and both parties have moved for summary judgment (dkts. 16 & 17). For the reasons stated below, Plaintiff's motion for summary judgment is granted, and Defendant's motion is denied.

## LEGAL STANDARDS

    The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

United States District Court
Northern District of California

"substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

In November of 2016, Plaintiff filed an application for disability insurance benefits and supplemental security income, alleging an onset date of January 2, 2014. *See* Administrative Record "*AR*" at 13.[2] As set forth in detail below, the ALJ found Plaintiff not disabled and denied the application on February 1, 2019. *Id*. at 13-26. The Appeals Council denied Plaintiff's request for review on December 19, 2019. *See id*. at 1-4. Thereafter, on February 13, 2020, Plaintiff sought review in this court. *See* Compl. (dkt. 1).

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff was born in San Francisco in 1971, at which time, he immediately began to express withdrawal symptoms from the narcotic pain medication his mother had been using; and, the entire course of Plaintiff's life thereafter has been marked with learning disabilities and cognitive impairments. *See AR* at 299, 663. Sadly, Plaintiff has fared no better from an emotional standpoint in that he has lived through many traumatizing experiences; specifically, his nephew was shot 28 times (and killed) at age thirteen, and another nephew was shot to death two weeks later. *Id*. at 54. Therefore, in addition to having been on the receiving end of gunfire himself, and

---

[2] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #15. *See* (dkts. 15-1 through 15-10).

having witnessed several of his friends being shot to death, Plaintiff has lived through the murders of two of his close relatives, as well as the sudden deaths (from illness) of several more of his close relatives. *Id*. at 637. As a result of all of this trauma, Plaintiff experiences frequent nightmares and insomnia; he avoids places and people that remind him of any of these past events; he has taken to alcohol consumption in order to help him forget these events; he has lost his ability to enjoy things he formerly enjoyed such as physical exercise or watching television; he is unable to concentrate; he frequently goes into a trance-like state and gets lost in his thoughts to such an extent that he is oblivious to his surroundings; he is plagued with persistent and unshakable feelings of anger rooted in the murders his nephews; and, such is the magnitude of his emotional symptoms, that they have directly impacted every facet of his social and family life. *Id*.

Throughout his early years, Plaintiff struggled in school, despite the fact that he was placed in special education classes from the earliest years of schooling. *Id*. at 292, 663. By the time he discontinued his schooling (in the eleventh grade) in order to work as a janitor at a fast food restaurant, Plaintiff was still unable to read or write with any degree of proficiency – a deficiency that continues to this day. *See id*. at 292, 668. Unable to keep any job for any sustained period of time, Plaintiff held a number of short-term jobs as a laborer until a series of entanglements with the justice system (based on drug possession and petty theft) saw him experience some intermittent periods of incarceration lasting a total of five years. *Id*. at 663-64. Thereafter, Plaintiff has experienced homelessness for most of his life (although he has been able to occasionally stay with his sister) as well as remaining unemployed due to the difficulty in finding jobs that would accommodate his cognitive issues, his literacy issues, and his emotional issues. *Id*. at 664, 668-69.

*Consultative Psychological Evaluations*

On December 9, 2016, Plaintiff was referred to Maria Kerosky, Ph.D., for a psychological evaluation at the request of the state disability determination office. *Id*. at 536-42. In addition to a review of some of Plaintiff's medical records, and a mental status exam, Dr. Kerosky also administered the Wechsler Adult Intelligence Scale, Fourth Ed. ("WAIS-IV"), the Wechsler Memory Scale, Fourth Ed. ("WMS-IV"), and both parts of the Trail Making Test ("TMT"). *Id*. at 536. At the outset, when asked to describe his problems, Plaintiff told Dr. Kerosky, "I can't read

and it makes me kind of frustrated . . . [s]ometimes I get embarrassed. Sometimes it just frustrates me . . . I can't read [] [a]nd I don't want to harm somebody or harm myself because it's there and I can't read it." *Id*. at 537. Plaintiff told Dr. Kerosky that he has been surrounded by death and violence, such that he has been unable to shake free from his preoccupation that he might one day suffer a similarly violent death; he added that "family deaths last 4-5 years; family members died, some got killed . . . I worry that something may happen to me." *Id*. Dr. Kerosky then noted Plaintiff's history of special education courses, as well as his history of head injuries which included Plaintiff having once been unconscious for as long as 10 minutes after being hit in the head with a baseball bat, as well as another occasion when he fell from a tree he had climbed. *Id*. at 537-38. As to his psychiatric history, Plaintiff reported a history of auditory hallucinations ("I was supposed to have a psychiatrist for my mental because sometimes I'll be hearing things"); and, regarding his legal entanglements, Dr. Kerosky noted that Plaintiff had been arrested ten times for petty thefts and drug possession, spending a total of 5 years in prison. *Id*. at 538. As to his daily activities, Plaintiff reported that he was most often homeless, that he was unable to go shopping or run errands without some degree of assistance, and that he was not able to drive. *Id*. at 538-39.

As a result of the mental status examination, Dr. Kerosky found that Plaintiff's work pace was slow; that "[h]is pencil holding was awkward"; and, that "he was not able to fill out the intake questionnaire." *Id*. at 539. It immediately appeared to Dr. Kerosky, even from simple conversation, that Plaintiff's short-term memory was in the borderline range while his verbal comprehension was mildly impaired. *Id*. In the domains concerning his fund of knowledge, abstract reasoning, and judgment, however, Plaintiff showed a greater degree of impairment – in these regards, Dr. Kerosky found that his knowledgebase was in the extremely low range, that he had difficulty finding similarities between abstract concepts, and that he had significant difficulty answering questions related to hypothetical situations. *Id*. Plaintiff's insight was characterized as fairly limited, and his affect appeared restricted in range; regarding his thought content, Dr. Kerosky noted his history of auditory hallucinations ("like somebody talking to me [saying] – you better watch your back"), all of which were related to his preoccupation with his deceased

United States District Court
Northern District of California

1  nephews, who were killed when they were 13 and 19 years old. *Id.*

2  Following the administering of the WAIS-IV and WMS-IV diagnostic tests – Plaintiff

3  achieved a full-scale IQ score of 67 (which is in the extremely low range of intellectual function),

4  while his immediate memory and his auditory memory tests resulted in index scores of 55 and 57

5  respectively (also in the extremely low range); his delayed memory and his visual memory

6  resulted in index scores of 70 and 73 respectively (which were in the borderline range). *Id.* at 540-

7  41. Consequently, Dr. Kerosky found that in a majority of the categories of cognitive function,

8  Plaintiff's performance was in the extremely low range: his full-scale IQ, his fund of knowledge,

9  and his knowledge of conventional standards of behavior were all in the extremely low range; his

10 numerical reasoning was in the borderline range; and, his visual memory operated in the impaired

11 range. *Id.* at 541. Meanwhile, Plaintiff's emotional functioning was marked by his history of

12 trauma, anxiety, depressive symptoms, difficulty concentrating, fatigue, auditory hallucinations,

13 difficulty coping with his cognitive limitations, nightmares, insomnia, and paranoid ideations – for

14 which, Dr. Kerosky opined that "[c]omprehensive mental health services are recommended." *Id.* at

15 541-42. In the end, Dr. Kerosky diagnosed Plaintiff with a depressive disorder (either an

16 unspecified form, or major depressive disorder), an unspecified anxiety disorder, the possibility of

17 posttraumatic stress disorder ("PTSD"), an unspecified neurocognitive disorder, alcohol use

18 disorder, and the possibility of a cannabis use disorder. *Id.* at 541. As a result of these diagnoses,

19 Dr. Kerosky opined that Plaintiff would be able to follow simple 1-step or 2-step instructions, but

20 that he would have marked impairment in the following categories of work-relating abilities:

21 following complex or detailed instructions; performing complex tasks; adapting to changes in the

22 job routine; adapting to stressors in the workplace; and, completing a normal workday without

23 interruptions related to his psychiatric condition. *Id.* at 542.

24 In May of 2018, Plaintiff was referred to Laura Jean Catlin, Psy.D., for a second

25 consultative examination that included a clinical interview, a mental status examination, and the

26 administering of the following diagnostic tests: the WAIS-IV; the Repeatable Battery for the

27 Assessment of Neuropsychological Status ("RBANS"); the Beck Depression Inventory ("BDI");

28 and, the Burns PTSD Inventory. *Id.* at 662-79. Additionally, Dr. Catlin also undertook a detailed

review of a large volume of Plaintiff's medical records from Highland Hospital, Alameda Hospital, Prison Medical Records, the Trust Lifelong Health Center, Dr. Kerosky's evaluation report, Plaintiff's assessment from Mental Health Advocates, Plaintiff's 90-2 Mental Health Assessment, and Plaintiff's medical records from the Bay Area Community Services. *Id*. at 662. At the outset, Dr. Catlin catalogued the specifics of Plaintiff's limitations in the activities of daily life as including difficulties in: performing his household chores; dealing with people he does not know; maintaining his friendships (due to his depression); concentrating and remembering to do important things; and, taking care of his hygiene and basic self-care activities. *Id*. at 663. Additionally, Dr. Catlin noted that Plaintiff no longer participates in formerly pleasurable activities, and that he has increasingly engaged in social isolation. *Id*. The mental status examination resulted in the following findings: Plaintiff's affect was flat and his mood was depressed and anxious; his thought content evidenced perseveration on negative content; his insight and judgment were limited; he reported persistent fatigue, insomnia, and a diminished appetite; and, Dr. Catlin also observed that his concentration was very poor and that his immediate and delayed memory were impaired. *Id*. at 665.

Upon the second administering of the WAIS-IV, Plaintiff's full-scale IQ was once again measured at 67 (which, again, is in the extremely low range). *Id*. at 673-79. As to the four categories of function measured by the RBANS (memory, visual/spatial abilities, language, and attention), Plaintiff's performance was measured as "severely impaired," or situated in the extremely low range, in each of the measured categories that combine to detect and track neurocognitive deficits. *Id*. at 665-67. Plaintiff's performance on the BDI was indicative of moderate depression in that he manifested the following symptoms: feeling sad and hopeless about the future; a loss of pleasure in life; feeling that he has failed in life; low self-esteem; feeling like he needs to cry but finding that he cannot; difficulties in making decisions or concentrating; persistent fatigue; and, increased irritability. *Id*. at 667. Consequently, Dr. Catlin diagnosed Plaintiff with major depressive disorder, intellectual disorder, alcohol use disorder, and persistent complex bereavement disorder – while noting that he had insufficient social insurance or welfare support, as well as enduring other problems related to his social environment. *Id*.

Dr. Catlin's prognosis was grim. *See id*. at 668-69. She noted that Plaintiff feels depressed (that is to say, sad, worthless, and hopeless), irritated, agitated, and anxious nearly all the time, and has used alcohol as a means to ease the effect of these symptoms *Id*. at 668. He suffers from insomnia, as a result of which he is perpetually tired. *Id*. He is unable to concentrate, or to sustain attention for any appreciable amount of time; consequently, he is unable to make decisions. *Id*. His anxiety manifests itself in the form of persistent worry and a constant feeling of doom which frequently matures into full-blown panic attacks. *Id*. He is also constantly tormented by memories of his deceased family members and by the loss that he feels due to the absence. *Id*. In conjunction with Plaintiff's intellectual disability, Dr. Catlin opined that "[h]e shows adaptive functioning deficits in conceptual, social, and practical domains." *Id*. Elaborating further on Plaintiff's adaptive functioning deficits, Dr. Catlin catalogued his deficits in this domain as such: he has difficulty with reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience; it is likewise difficult for Plaintiff to understand and follow directions; he has failed to meet developmental and socio-cultural standards for personal independence and social responsibility such as by living independently and maintaining employment; his adaptive deficits limit his functioning in such areas as communication, social participation, and independent living; in the conceptual domain, he has difficulties in learning skills that might help him improve his reading, writing, arithmetic, as well as time and money management; in the social domain, Plaintiff has remained immature in his social interactions, as well as being immature in his communication style; he is unable to regulate his emotions and behavior in an age appropriate fashion; he has a limited understanding of risk in social situations; his social judgment is immature for his age, placing him at risk of being manipulated by others; in the practical domain, his deficits are manifest in his ability to complete many tasks of daily living, in that he requires assistance with grocery shopping, food preparation, transportation, and banking and money management. *Id*. at 668-69. Dr. Catlin added that Plaintiff's mental health disorders preexisted his alcohol and substance abuse disorder, and that his inability to function in the workplace would still exist even in the absence of his substance abuse disorder. *Id*. at 669.

Based on his overall condition, Dr. Catlin opined that Plaintiff would be unable to function

United States District Court
Northern District of California

in any workplace setting due to: his difficulty learning new tasks or taking instruction; his difficulty in applying information given to him; his difficulty interacting with others; his irritability, his emotional sensitivity, and his inability to navigate most social interactions in an appropriate manner; his distractibility due to depressive thoughts and memories; his diminished ability to maintain concentration; his inability to persist through frustrating tasks; his inability to organize himself such as to arrive on time for work in any consistent manner; his inability to function independently, appropriately, effectively, and on a sustained basis; his inability to manage stress and mental demands, rendering him vulnerable to decompensation; his minimal capacity to adapt to changes in his environment; and, his impaired executive functions such as his greatly diminished impulse control and frustration tolerance, as well as his inability to summon appropriate responses to stress. *Id*. On this basis, while Dr. Catlin opined that Plaintiff had no impairment in adhering to basic standards of neatness and cleanliness, he exhibited marked impairment in every other conceivable category of work-related functioning. *See id*. at 670-71. Furthermore, Dr. Catlin added that Plaintiff has experienced multiple episodes of decompensation within a 12-month period, and that his impairments "will cause him to be absent from work more than four days a month," such that he "is unable to engage in any meaningful employment and would not be able to obtain or retain a job . . . [given that his] condition is expected to last at least 12 months." *Id*. at 671.

*Corroborating Medical Records from Treating Sources*

In addition to the two above-described opinions of the only examining psychologists involved in this case (Drs. Kerosky and Catlin), the remainder of the medical records in this case is teeming with support for the conclusions and limitations opined by Drs. Kerosky and Catlin. For example, while Plaintiff was being treated for his physical impairments by his doctors at the Lifelong Trust Health Center in Oakland, those medical records consistently reflected the existence of his psychiatric problems, his cognitive problems, his literacy issues, his auditory hallucinations, his history of trauma, his depression, his anxiety, his insomnia, and his diminished appetite resulting in undesired weight loss. *See id*. at 509, 513-16, 525, 555, 561, 567, 571, 577, 594, 599, 603, 604-05, 620-21 ("Plaintiff has lost 25 pounds unintentionally in the last 6

8

United States District Court
Northern District of California

1    months."). As a result, his treatment providers at Lifelong Trust referred Plaintiff for

2    psychotherapy. *See e.g., id*. at 605.

3         In April of 2017, Marc Teitelbaum (Plaintiff's treating marriage and family therapist) at

4    Mental Health Advocates in Oakland evaluated Plaintiff and noted that his mood was depressed

5    and anxious while his affect was flat, blunted, and incongruent. *Id*. at 589. It was also noted that

6    Plaintiff's energy levels were low and his appetite was poor in that, "[i]f he eats too much he feels

7    like vomiting." *Id*. at 588. Noting his lack of impulse control and his impaired judgment, Therapist

8    Teitelbaum diagnosed Plaintiff with chronic PTSD, manifesting in symptoms of depression,

9    anxiety, feelings of hopelessness, lack of energy, paranoid ideation, problems with concentration,

10   poor appetite, anger management, impulse control issues, auditory hallucinations, and "a constant

11   and overwhelming fear for his children's safety and wellbeing." *Id*. 589-90. As to his limitations,

12   Therapist Teitelbaum opined that Plaintiff was unable to work due to experiencing marked

13   limitations in the following domains of work-related abilities: the ability to work in coordination

14   with or in proximity to others without being unduly distracted by them; the ability to complete a

15   normal workday without interruptions from psychologically based symptoms, or to perform at a

16   consistent pace without an unreasonable number and length of rest periods; the ability to accept

17   instructions and respond appropriately to criticism from supervisors; and, the ability to get along

18   with co-workers and peers without unduly distracting them or exhibiting behavioral extremes. *Id*.

19   at 591 (Plaintiff was then described as experiencing moderate limitations in another five domains

20   of work-related abilities). Similarly, records from the Alameda County Behavioral Health Care

21   Services, from 2017, reflect consistent diagnoses for PTSD, as well as findings that are consistent

22   with the findings and opinions discussed above. *See e.g., id*. at 626-30, 633-37, 642-59, 710. For

23   example, in October of 2017, Anestacia Stanley, MFT, noted Plaintiff's PTSD and depression and

24   observed that "[s]one of the symptoms that he is currently presenting with are anhedonia, thought

25   blocking, dissociation, being angry at what happened, and having memories he can't avoid

26   having." *Id*. at 628.

27   *Lay Witness Testimony*

28        In December of 2016, Plaintiff's sister submitted a third-party function report. *See id*. at

                                                9

United States District Court
Northern District of California

292-301. She noted that, due to his medical and psychological conditions, Plaintiff has been unable to work and has therefore been experiencing homelessness such that he sleeps at different relatives' homes from time to time. *Id*. at 292. This account of Plaintiff's symptoms and the ensuing limitations is consistent with the above-described findings and opinions expressed by his doctors. *See id*. 292-301. What sets his sister's account apart is the fact that she has known Plaintiff since childhood and is therefore particularly well situated to speak to the longevity attending Plaintiff's deficits in adaptive functioning. In this regard, she noted the following: Plaintiff has been in special education since kindergarten (*id*. at 292); he has three children but he needs his mother's help in caring for them (*id*. at 293); he has always been disabled and has always needed help from his relatives to function (*id*.); he requires assistance in picking out which clothes to wear as well as with washing his clothes (*id*.); he must be constantly reminded to bathe, shave, and to brush his teeth (*id*. at 294); when he is put to doing chores such as emptying the garbage or washing dishes, it takes him several hours "because he gets off focus [and] he forgets what he was doing" (*id*.); he has never sought licensure for operating an automobile because "he's afraid he won't be able to pass [the] written test because he can't read" (*id*. at 295); he requires help when shopping because his inability to concentrate or maintain focus results in it taking up to three hours to select a single pair of pants (*id*.); because of his inability to read, Plaintiff is unable to use or manage a bank account, a checkbook, or money orders (*id*.); his deficits in his ability to handle money or manage himself date back to the earliest days of his childhood (*id*. at 296); when Plaintiff has any sort of appointment, he must be repeatedly reminded, and then accompanied, in order to ensure that he actually manages to be at the right place, at the right time (*id*.); he has experienced these problems with talking, memory, completing tasks, concentration, understanding, following directions, and getting along ever since he was five years old (*id*. at 297); the upper end of his ability to pay attention is approximately 3 minutes (*id*.); and, the only change in Plaintiff's condition has been that, with the passage of time, his paranoia and his suicidal thoughts have increased (*id*. at 298). Plaintiff's sister added that in addition to being shot at himself, Plaintiff has witnessed others being shot and killed while standing "right next to him." *Id*. at 300. Lastly, she summarized Plaintiff's life as such: "[he] has been diagnosed with [a]

10

1    learning disability and depression and was born with withdrawals from pain medication [that] his

2    mother was taking . . . he's had problems all throughout [his] life trying to maintain as a normal

3    citizen, however, he was placed in prison numerous [] times because they refused to give him any

4    mental health care . . . he's given up on himself and constantly needs to be reminded that he's a

5    good person." *Id*. at 299.

6    *Vocational Expert ("VE") Testimony*

7          The ALJ conducted a hearing on this claim in September of 2018. *See id*. at 32-80.

8    Therein, the VE was asked if a hypothetical person with Plaintiff's education and background

9    would be employable if that person had to be off-task 15 percent of the time – the VE answered in

10   the negative. *Id*. at 75. When the VE was asked if such a hypothetical person would be employable

11   if they were to be absent from work twice per month, the VE similarly answered in the negative.

12   *Id*. at 75-76.

13         **THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

14         A person filing a claim for social security disability benefits ("the claimant") must show

15   that he has the "inability to do any substantial gainful activity by reason of any medically

16   determinable physical or mental impairment" which has lasted or is expected to last for twelve or

17   more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[3] The ALJ must consider all evidence in

18   the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-

19   step sequential evaluation process to determine whether the claimant is disabled (*see id*. §

20   416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that

21   the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

22         Here, the ALJ set forth the applicable law under the required five-step sequential

23   evaluation process. *AR* at 14-15. At Step One, the claimant bears the burden of showing he has not

24   been engaged in "substantial gainful activity" since the alleged date on which the claimant became

25   disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be

26

27   _____

3    The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II)
28   are virtually identical though found in different sections of the CFR. For the sake of convenience, the court
     will generally cite to the SSI regulations herein unless noted otherwise.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that

2    Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2014,

3    and that he had not engaged in substantial gainful activity since the alleged onset date. *AR* at 15-

4    16. At Step Two, the claimant bears the burden of showing that he has a medically severe

5    impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An

6    impairment is not severe if it is merely 'a slight abnormality (or combination of slight

7    abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'"

8    *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). At Step

9    Two, the ALJ found that Plaintiff suffered from the following severe impairments: type II

10   diabetes, alcohol-related pancreatitis, hyperlipidemia, alcohol abuse disorder, cannabis use

11   disorder, major depressive disorder, and mild borderline intellectual disorder. *Id*. at 15. However,

12   neither at Step Two, nor elsewhere in the decision did the ALJ bother to engage in any meaningful

13   discussion of Plaintiff's anxiety disorder (diagnosed by Dr. Kerosky and Plaintiff's other treatment

14   providers); his PTSD (diagnosed by Dr. Kerosky and his treatment providers); his unspecified

15   neurocognitive disorder (diagnosed by Dr. Kerosky); or his persistent complex bereavement

16   disorder (diagnosed by Dr. Catlin). *See id*. at 16-24.

17        At Step Three, the ALJ compares the claimant's impairments to the impairments listed in

18   appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the

19   burden of showing his impairments meet or equal an impairment in the listing. *Id*. If the claimant

20   is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful,

21   the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four.

22   *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or

23   combination of impairments that met or medically equaled the severity of any of the listed

24   impairments. *AR* at 16-17. Next, the ALJ determined that Plaintiff retained the RFC to perform

25   work at the medium exertional level but with the following limitations and exceptions: Plaintiff

26   can only understand, remember, and carry out simple 1-step or 2-step routine and repetitive tasks,

27   involving no more than simple work-related decisions and no workplace changes; Plaintiff can

28   perform work which would not entail performing tasks in tandem with others in the workplace and

1    with no more than brief, superficial interaction with the general public; Plaintiff should be

2    expected to be off-task 10 percent of the time and absent one day per month; and, Plaintiff should

3    be limited to work that does not involve fast-paced production requirements. *Id.* at 17-24.

4          At Step Four, the ALJ determined that Plaintiff is unable to perform his past relevant work.

5    *Id.* at 24. Lastly, at Step Five, the ALJ concluded, based on the RFC, Plaintiff's age, education,

6    and the VE's testimony, that there are jobs that exist in significant numbers which Plaintiff could

7    perform – namely, the ALJ found that Plaintiff could perform the functions of a packager, an

8    automobile detailer, or a dishwasher. *Id.* at 25. Thus, the ALJ concluded that Plaintiff had not been

9    under a disability, as defined in the Social Security Act, since his alleged onset date, January 2,

10   2014. *Id.* at 25-26.

11                                    **DISCUSSION**

12         Based on the record as described above, Plaintiff submits that due to the ALJ's improper

13   weighing of the evidence, this case satisfies the conditions of the credit-as-true doctrine: because

14   the ALJ failed to provide legally sufficient reasons for rejecting this evidence; because, when

15   properly credited, the evidence would require the ALJ to find Plaintiff disabled on remand;

16   because there are no outstanding issues that need to be resolved before a disability determination

17   may be rendered; and, because a review of the record as a whole does not give rise to any serious

18   doubt that Plaintiff is, in fact, disabled. *See* Pl.'s Mot. (dkt. 16) at 8-25. Defendant disagrees in all

19   respects and submits that the ALJ committed no reversible error whatsoever. *See* Def.'s Mot. (dkt.

20   17) at 7-17.

21         As to the conditions underlying Plaintiff's overall mental health, the ALJ rejected the

22   opinions of every examining and treating source, and based the decision (from Step Two forward)

23   entirely on the opinions of non-examining state agency consultants that reviewed Plaintiff's

24   application at the initial and reconsideration stages. *See AR* at 22-24. The ALJ's explanation for

25   rejecting Dr. Catlin's opinions are non-specific, unpersuasive, and not based on substantial

26   evidence. First, the ALJ incorrectly suggested that "[t]he findings of Dr. Caitlin (sic) are not

27   consistent with the entire evidence of record." *Id.* at 22. The ALJ rested this erroneous contention

28   on the following faulty foundation: (1) that Plaintiff received routine and conservative mental

United States District Court
Northern District of California

13

health treatment (essentially faulting Plaintiff for his poverty); (2) that Plaintiff worked as a food handler while in prison; (3) that Plaintiff testified to having been placed on mental health medications one week prior to the hearing, while saying that the medications "work[] so far, but I still feel depressed sometimes"; (4) that Plaintiff reportedly stated that his "medications help him want to get up and interact with others"; (5) that Plaintiff discontinued drinking some 2 months before the hearing; (6) and, that (when examined for his physical illnesses, such as his diabetes) none of the nurses or intake professionals noted any disturbing psychiatric findings. *Id*. at 22. Based on the same reasoning, the ALJ similarly rejected Dr. Kerosky's opinions regarding Plaintiff's marked limitations in a number of work-related domains of functioning. *Id*. at 23 (i.e., receiving "conservative" mental health treatment, working as a food handler in prison, not taking any mental health medications while in prison, and that no nurse or intake professional noted any significant psychiatric symptoms during any of his *physical* examinations). The ALJ also placed a great deal of reliance on the notion that Plaintiff had "admitted [to] being capable of reading little portions of a newspaper and some [portions] of a McDonald's menu." *Id*. at 18. In any event, for these same reasons, the ALJ also rejected the opinions of Therapist Teitelbaum. *Id*. at 22. Finally, the ALJ also rejected the testimonial account provided by Plaintiff's sister, explaining only that "her statements are not support by the clinical or diagnostic medical evidence that is discussed elsewhere in his decision." *Id*. In the end, having rejected the entirety of the medical and lay-witness evidence related to Plaintiff's mental health, the ALJ made it clear that the RFC was entirely based on the opinion of the non-examining state agency consultant (*see id*. at 89) with a few minor modifications made by the ALJ himself (*see id*. at 17); and, leaving no room for doubt about this fact, the ALJ expressly noted that the opinion of the state agency consultants was given "significant weight," meaning that this was the only opinion regarding Plaintiff's mental health condition that was not rejected. *Id*. at 24.

Medical opinions are "distinguished by three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating

provider is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Revels*, 874 F.3d at 654. In cases where a treating doctor's opinion is not controlling, the opinion is weighted according to factors such as the nature and extent of the treatment relationship, as well as the consistency of the opinion with the record. 20 C.F.R. § 404.1527(c)(2)-(6); *Revels*, 874 F.3d at 654.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Further, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831; *see also Revels*, 874 F.3d at 654-55; *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993). In situations where a Plaintiff's condition progressively deteriorates, the most recent medical report is the most probative. *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986).

It will not be necessary to determine whether or not the later-rendered findings and opinions of Dr. Catlin and Dr. Kerosky were "contradicted" by the earlier-rendered opinions of the non-examining state agency consultants because the ALJ's explanations for rejecting this evidence

did not even rise to the standard of specific and legitimate reasons supported by substantial evidence because, in light of the record as a whole (as described in detail above), it cannot be reasonably said that the outlier and conclusory opinion of the state agency consultants (as modified by the ALJ), by itself, constitutes "substantial evidence." Or, put another way, it is simply not possible to conclude – in light of the test results, findings, and consistent opinions rendered by Drs. Catlin and Kerosky, and Therapist Teitelbaum – that the preceding opinion by a non-examining consultant can, in and of itself, be characterized as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" to the effect that Plaintiff's mental health conditions are attended with so few limitations as are found in the RFC described above. *See Biestek*, 139 S. Ct. at 1154.

The ALJ in this case made no shortage of errors. First, the ALJ failed to give any meaningful consideration to Plaintiff's anxiety disorder, PTSD, unspecified neurocognitive disorder, or his persistent complex bereavement disorder. *See AR* at 16-24. Second, it was error for the ALJ to give controlling weight to the opinions of non-examining consultants, and to exclusively base the Step Three analysis and the RFC findings on those opinions given the fact that they are contradicted by the overwhelming weight of the medical evidence as discussed above. Further, as mentioned above, those opinions cannot by themselves constitute substantial evidence that justifies the rejection of the consistent and well-founded opinions of two examining psychologists, as confirmed and corroborated by the entirety of the medical evidence. In short, the ALJ's decision to reject the opinions of Drs. Kerosky and Catlin, as well as the opinion of Therapist Teitelbaum, rested on the faulty reasoning described above, and was based on a near-complete misapprehension of the evidentiary record in this case. Neither of the examining psychologists' opinions are in any way called into question by the fact that Plaintiff was made to serve food to other prisoners, or by the notion that Plaintiff may be able to read small snippets of a newspaper or portions of a McDonald's menu, or, for any of the other reasons relied upon by the ALJ. Accordingly, the court now finds that the opinions of Drs. Catlin, and Kerosky, as bolstered and corroborated by the opinion of Therapist Teitelbaum, were improperly rejected (based on non-specific and illegitimate reasoning); therefore, those opinions will now be credited-as-true as a

1  matter of law because they are supported by the overwhelming weight of the evidence in this case.

2  Third, the ALJ improperly also rejected the account provided by Plaintiff's sister. *See id*. at

3  19. In this regard, the ALJ merely stated that "her statements are not supported by the clinical or

4  diagnostic medical evidence that is discussed elsewhere in this decision." *Id*. In order to reject the

5  testimonial statements of a lay-witness, an ALJ must "give[] reasons germane to each witness for

6  doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). The reasons advanced for rejecting

7  lay-witness testimony must also be "specific." *Stout v. Comm'r, SSA*, 454 F.3d 1050, 1054 (9th

8  Cir. 2006). Germane reasons for discrediting such testimony could include inconsistency with the

9  medical evidence, or the fact that the testimony "generally repeat[s]" the properly discredited

10  testimony of a claimant. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). However, it is

11  important to note that the mere lack of support from medical records is not a germane reason to

12  discount lay-witness testimony. *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017). Here, in

13  violation of the holding in *Diedrich*, the ALJ merely stated that this witness's statements lacked

14  support in the clinical or diagnostic medical evidence of record; which, is not only a derogation of

15  the teachings of *Diedrich*, but it is factually incorrect. The account provided by Plaintiff's sister, as

16  to the history of his adaptive functioning deficits, is fully harmonious with Dr. Catlin's opinions

17  about the duration and intensity of those deficits. *Compare AR* at 292-301 (3rd Party Function

18  Report) *with id*. at 668-69 (Dr. Catlin's report). Accordingly, because the ALJ improperly rejected

19  the testimony of Plaintiff's sister, that testimony will now be credited as true as a matter of law.

20  ### Nature of Remand

21  The decision whether to remand for further proceedings or for payment of benefits

22  generally turns on the likely utility of further proceedings. *Carmickle v. Comm'r, SSA*, 533 F.3d

23  1155, 1169 (9th Cir. 2008). A district court may "direct an award of benefits where the record has

24  been fully developed and where further administrative proceedings would serve no useful

25  purpose." *Smolen*, 80 F.3d at 1292. The Court of Appeals for the Ninth Circuit has established a

26  three-part test "for determining when evidence should be credited and an immediate award of

27  benefits directed." *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Remand for an

28  immediate award of benefits is appropriate when: (1) the ALJ has failed to provide legally

United States District Court
Northern District of California

sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and, (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id*. The second and third prongs of the test often merge into a single question; that is, whether the ALJ would have to award benefits if the case were remanded for further proceedings. *Id*. at 1178 n.2; *see also Garrison v. Colvin*, 759 F.3d 995, 1021-23 (9th Cir. 2014) (when all three conditions of the credit-as-true rule are satisfied, and a careful review of the record discloses no reason to seriously doubt that a claimant is, in fact, disabled, a remand for a calculation and award of benefits is required).

Here, in light of the above-discussed and improperly discredited lay-witness account and medical opinion evidence, two things are clear: first, it is clear that Plaintiff has in fact been disabled since his alleged onset date (at least), and second, it is clear that further administrative proceedings would be useless because the ALJ would be required to find Plaintiff disabled on remand. Plaintiff's intellectual disability, his major depressive disorder, and his PTSD – each – would undoubtedly compel independent disability findings at Step Three because they each clearly meet the criteria for the three relevant listings, to wit: Listing 12.04(A)(1) (depressive disorder), Listing 12.15 (trauma-related disorders), and Listing 12.05 (intellectual disorder)). *See* 20 C.F.R. Pt. 404, Subpt. P, app. 1, §§ 12.04, 12.05, 12.15.[4]

The first reason that further administrative proceedings would be useless is that based on the improperly discredited evidence, Plaintiff's condition clearly meets the criteria of Listing 12.04(A)(1), pertaining to depressive disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04. To satisfy the criteria of Listing 12.04, it is necessary to satisfy the pertinent criteria listed in subparts (A)(1) and (B), or (A)(1) and (C). *See id*. Subpart (A) requires medical documentation of a depressive disorder, characterized by five or more of the following: depressed mood; diminished

---

[4] At this juncture, it should not go without mention that the ALJ stated that "[n]o treating or examining physician has recorded findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listing of Impairments. *AR* at 16. However, as discussed *infra*, that is *precisely* the nature of the findings recorded by Dr. Catlin and Dr. Kerosky.

interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; observable psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; or thoughts of death or suicide. § 12.04(A). As discussed above, Dr. Catlin found that Plaintiff met eight of these criteria, basically every category with the exception of psychomotor agitation or retardation. *See AR* at 663-67. As to these criteria, Dr. Kerosky's view encompassed largely the same findings. *See id*. at 537-42. Turning to Subpart (B) of Listing 12.04, that provision requires: extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; adapting or managing oneself. § 12.04(B). Dr. Catlin found marked limitations in every conceivable category of work-related function. *See AR* at 670-71. Dr. Kerosky found marked limitations in Plaintiff's ability to follow complex or detailed instructions; to perform complex tasks; to adapt to changes in the job routine; to adapt to stressors in the workplace; and to complete a normal workday without interruptions related to his psychiatric conditions (which is the substantial equivalent of finding marked limitations in at least two of the Subpart B criteria). *Id*. at 542. Thus, Plaintiff's depression has clearly been disabling under Listing 12.04(A)(1) and (B) since his alleged onset date.

The second reason that further administrative proceedings would be useless is that Plaintiff's PTSD also meets or equals the criteria of Listing 12.15. As was the case above, in order to satisfy the criteria for listing-level PTSD under §12.15 – it is necessary to satisfy the pertinent criteria listed in subparts (A) and (B), or (A) and (C). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.15. The first part of Listing 12.15(A) requires meeting all of the following criteria: exposure to actual or threatened death, serious injury, or violence; subsequent involuntary re-experiencing of the traumatic event (e.g., intrusive memories, flashbacks, or dreams); avoidance of external reminders of the event; disturbances in mood and behavior; and, increases in arousal and reactivity (e.g., exaggerated startle response or sleep disturbance). *Id*. Once again, as discussed above, the record reflects that Plaintiff's condition satisfies all of these criteria as a result of his history of trauma and its ensuing effects. *See e.g.*, *AR* at 537-42, 665-68. Subpart (B) has the same requirements and criteria discussed above; and, again, Dr. Catlin found marked limitations in

1   every conceivable category of work-related function (*see id*. at 670-71) while Dr. Kerosky (*see id*.

2   at 542) found marked limitations in Plaintiff's ability to follow complex or detailed instructions; to

3   perform complex tasks; to adapt to changes in the job routine; to adapt to stressors in the

4   workplace; and to complete a normal workday without interruptions related to his psychiatric

5   condition (which is the substantial equivalent of finding marked limitations in at least two of the

6   Subpart B criteria). Accordingly, Plaintiff's PTSD has also been clearly disabling under Listing

7   12.15(A) and (B) since his alleged onset date.

8          Most importantly, the third reason that further administrative proceedings would be a

9   waste of time is that Plaintiff's intellectual disorder also clearly meets or equals the criteria set

10  forth in Listing 12.05(B). In order to satisfy the criteria for listing-level intellectual disorder under

11  §12.05 – it is necessary to satisfy the pertinent criteria listed in either subpart (A) or (B). *See* 20

12  C.F.R. Pt. 404, Subpt. P, App. 1, §12.05. The criteria set forth in Subpart (B) require a full-scale

13  IQ score of 70 or below; significant deficits in adaptive functioning currently manifested by

14  extreme limitation of one, or marked limitation of two of the following areas of mental

15  functioning: understanding, remembering, or applying information; interacting with others;

16  concentrating, persisting, or maintaining pace; and adapting or managing oneself – additionally,

17  the evidence about the current level of intellectual and adaptive functioning should demonstrate or

18  support the conclusion that the disorder began prior to the age of 22. *See id*. at §12.05(B)(1)-(3).

19  As discussed above, on two separate occasions, Plaintiff's performance on the WAIS-IV has

20  resulted in an unchallenged and unimpeached full-scale IQ score of 67. *See AR* at 540, 67.

21  Furthermore, as mentioned above, Dr. Catlin found marked limitations in every conceivable

22  category of work-related function (*see id*. at 670-71) and Dr. Kerosky (*see id*. at 542) found

23  marked limitations in areas that are the substantial equivalent of finding marked limitations in at

24  least two of the Subpart B criteria. With regard to evidence of the onset of the disorder prior to the

25  age of 22, the record is teeming with such evidence. First, Dr. Catlin expressly opined that

26  Plaintiff's adaptive functioning deficits have been with him his entire life. *See id*. at 668-69.

27  Specifically, she noted the fact that Plaintiff required special education for the entire duration of

28  his schooling; and, moreover, that even 11 years of special education was incapable of helping

United States District Court
Northern District of California

1   Plaintiff attain the ability to read or write. *Id*. at 668. In fact, in the context of discussing his many

2   deficits in adaptive functioning, and after noting that he began consuming alcohol at the age of 12,

3   Dr. Catlin specifically opined that "[h]is mental health condition most likely preexisted before his

4   substance use disorder." *Id*. at 668-69. Further, Dr. Catlin also noted that "[h]e has never lived

5   independently and has had limited employment. He has been unsuccessful in school and has a

6   limited education." *Id*. at 669. Finally, to the extent that more support would be needed for this

7   conclusion, Plaintiff's sister repeatedly noted that he has endured these adaptive functioning

8   deficits for the entirety of his life. *See id*. at 292-300. Thus, Plaintiff's intellectual disorder has

9   also been clearly disabling under Listing 12.05(B) since his alleged onset date.

10       The fourth reason that the record conclusively establishes that Plaintiff has been disabled

11   since his alleged onset date is that the combination of these mental impairments would surely

12   compel a disability finding during the formulation of the RFC. Given the fact that the improperly

13   rejected evidence established marked limitations in all of the areas of mental functioning, the

14   unavoidable conclusion is that Plaintiff has had no residual capacity to function in the workplace

15   at all. Indeed, Dr. Catlin specifically noted that, in light of the fact that Plaintiff has experienced

16   multiple episodes of decompensation within a 12-month period, he "is unable to engage in any

17   meaningful employment and would not be able to obtain or retain a job . . . [given that his]

18   condition is expected to last at least 12 months." *AR*. at 671.

19       Turning to the fifth and final reason that further proceedings would be futile – when the

20   improperly rejected evidence is given effect, the ALJ would be required to find Plaintiff disabled

21   at Step Five based on the VE's testimony. As mentioned above, the VE testified that someone

22   with Plaintiff's education and background would not be employable if they would be off-task 15

23   percent of the time; or, if they would be absent from work as little as two days per month. *Id*. at

24   75-76. Dr. Catlin opined that Plaintiff would be off-task nearly all of the time, and that he would

25   be absent from work more than four days per month. *Id*. at 670-71. Therefore, on remand, Plaintiff

26   would also be found disabled at Step Five based on the testimony of the VE.

27       At this juncture, the court will note that in cases where each of the credit-as-true factors is

28   met, it is generally only in "rare instances" where a review of the record as a whole gives rise to a

"serious doubt as to whether the claimant is actually disabled." *Revels*, 874 F.3d at 668 n.8 (citing *Garrison*, 759 F.3d at 1021). This is not one of those "rare instances," as the record leaves no room to doubt that Plaintiff has in fact been disabled, at least since his alleged onset date, if not much earlier. Needlessly remanding a disability claim for further unnecessary proceedings would only delay much needed income for claimants such as Plaintiff who are unable to work and who are entitled to benefits; doing so would in turn subject them to "tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand." *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988). The court is satisfied that the ALJ's unsupported conclusions were thoroughly negated by the overwhelming weight of the record evidence which conclusively and convincingly establishes Plaintiff's disability and that no further inquiry is necessary.

## CONCLUSION

Accordingly, for the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 16) is **GRANTED**, and Defendant's Cross-Motion (dkt. 17) is **DENIED**. The ALJ's finding of non-disability is **REVERSED**, and the case is **REMANDED** for the immediate calculation and payment of appropriate benefits.

**IT IS SO ORDERED.**

Dated: March 17, 2021

ROBERT M. ILLMAN
United States Magistrate Judge